**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

NICOLE L. SCHOEN,

        **Plaintiff,**

    v.                            **Civil Action 2:17-cv-648**
                                    **Magistrate Judge Jolson**

BANK OF AMERICA, N.A.,

        **Defendant.**

## OPINION AND ORDER

This matter, in which the parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Doc. 7), is before the Court on Plaintiff Nicole Rollins' (formerly Nicole Schoen) Motion for Summary Judgment (Doc. 27) and Defendant Bank of America, N.A.'s Motion for Summary Judgment (Doc. 25). Fully briefed, the matter is ripe for decision. For the reasons that follow, the parties' cross motions are **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

On December 24, 2009, Plaintiff purchased a house in New Albany, Ohio. (Doc. 1 at ¶ 13). To make the purchase, Plaintiff took out a Federal Housing Administration ("FHA") loan from American Midwest Mortgage Corporation, which was backed by a mortgage by Mortgage Electronic Registration Systems, Inc. as nominee for American Midwest Mortgage Corporation. (Doc. 25-1 at ¶ 4–5). Relevant here, Defendant Bank of America, N.A. began servicing the loan on March 1, 2010. (*Id.* at ¶ 4).

Unfortunately, Plaintiff began to fall behind on her monthly mortgage payments on or about January 2014. (Doc. 21-1 at 18–20). Roughly eight months later, on August 26, 2014,

Defendant filed to foreclose upon the property. (Doc. 27-3). In response, Plaintiff requested mediation regarding the foreclosure action. (Doc. 27-4). Defendant sent Plaintiff a letter instructing her to contact Defendant's foreclosure counsel, Manley, Deas & Kochalski, LLC ("MDK"), if she had any questions concerning the mediation. (Doc. 27-5).

On December 5, 2014, Plaintiff submitted a loss mitigation packet to MDK. (Doc. 27-6). On December 11, 2014, Defendant received the packet and then acknowledged receipt on December 13, 2014. (Doc. 25-1 at ¶ 6). On December 16, 2014, Defendant notified Plaintiff that her application was incomplete (Doc. 27-7) and requested information regarding a bonus Plaintiff received, an additional month of bank statements, and a signed and dated tax return. (Doc. 25-4). On January 5, 2015, Plaintiff supplemented her application. (Doc. 27-8 at 2). In response, Defendant requested a signed and dated letter of explanation regarding a performance bonus. (Doc. 27-8 at 1). Plaintiff responded on January 7, 2015. (*Id.* at 13).

On January 9, 2015, Defendant sent a letter requesting a written explanation "to understand some of the transactions" on Plaintiff's bank account statements. (Doc. 27-9). The request did not state the specific transactions to be explained but instead directed Plaintiff to contact a customer relationship manager for further detail. (*Id.*). On January 14, 2015, Defendant contacted Plaintiff through MDK asking for a signed and dated letter explaining a $1,200 withdrawal that appeared on Plaintiff's December 2014 bank statement. (Doc. 27-10). That same day, Plaintiff responded that the withdrawal was a daycare expense. (*Id.*).

Plaintiff was approved for a trial modification agreement on January 23, 2015, under the FHA's Home Affordable Modification Program (FHA-HAMP). (Doc. 27-11). Plaintiff made three trial payments—as required under the trial plan—after which Defendant sent Plaintiff a letter notifying her of her approval for a loan modification under the FHA-HAMP. (Doc. 25-9; Doc.

27-12). This letter stated that Plaintiff was required to submit the following documents by June 11, 2015 to receive the permanent modification: A signed and notarized Loan Modification Agreement, a signed Partial Claim Subordinate Note, and a signed and notarized Subordinate Partial Claim Security Instrument (the "Required Documents"). (*Id.*).

Plaintiff made four attempts to submit the Required Documents. Defendant rejected the first three for perceived notary errors and rejected the fourth for untimeliness.

Plaintiff first submitted the Required Documents on June 9, 2015. (Doc. 27-13). Three days later, on June 12, 2015, Defendant sent Plaintiff a letter stating that the required notary signatures were defective and requested that Plaintiff re-sign and re-notarize the documents. (Doc. 27-14).

On June 17, 2015, Plaintiff submitted a second copy of the Required Documents with new signatures and notarization. (Doc. 27-15). On July 3, 2015, Defendant again notified Plaintiff that the notarization was defective and requested Plaintiff re-sign and notarize the documents. (Doc. 27-16).

On July 15, 2015, Plaintiff submitted a third copy of the Required Documents with new signatures and notarization. (Doc. 27-18). On July 23, 2015, Defendant again notified Plaintiff that the notary was defective and requested the documents to be re-signed, notarized, and sent to Defendant no later than August 7, 2015. (Doc. 27-19).

On August 12, 2015, Defendant notified Plaintiff that she was no longer eligible for a permanent loan modification under FHA-HAMP because it had not received the Required Documents. (Doc. 27-21). For a fourth time, Plaintiff submitted the Required Documents; the signatures on these Required Documents are dated August 27, 2015. (Doc. 28-16). Plaintiff's fourth submission was denied by Defendant because it was submitted after the specified deadline.

(Doc. 28-17).

In the months of July, August, and September of 2015—the time period that Plaintiff attempted to submit the Required Documents—she paid $1,508.23 per month, as required under the permanent loan modification.  (Docs. 27-12; 27-17; 27-20; 27-22).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial "responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record that demonstrate "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).  A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (defining "genuine" as more than "some metaphysical doubt as to the material facts").  Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III.    DISCUSSION

Plaintiff alleges three counts against Defendant: 1) violation of the Real Estate Settlement Procedures Act and implementing regulations ("RESPA"), 2) breach of contract, and 3) fraud.

(*See generally* Doc. 1). Both Plaintiff and Defendant submitted cross motions for summary judgment on claims brought under 12 C.F.R. § 1024.41(b)(2), 12 C.F.R. § 1024.41(b)(1), 12 C.F.R. § 1024.41(e)(2)(iii), 12 U.S.C. § 1601 *et. seq.*, and breach of contract. Only Defendant moves for summary judgment on Plaintiff's 12 C.F.R. § 1024.41(c)(1), 12 C.F.R. § 1024.38(b)(2), and fraud claims, and Plaintiff has not responded to Defendant's motion on these claims. The Court will consider each claim in turn.

### A. Real Estate Settlement Procedures Act

"RESPA is a consumer protection statute that regulates the real estate settlement process." *James v. Ocwen Loan Serv., LLC*, No. 1:17-cv-0501, 2017 U.S. Dist. LEXIS 203790 at *9, 2017 WL 6336760 (S.D. Ohio Dec. 12, 2017), report and recommendation adopted, 2018 U.S. Dist. LEXIS 35965, 2018 WL 1173035 (internal quotations omitted). Congress intended RESPA "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." *Id.* (quoting 12 U.S.C. § 2601(a)). "Although the 'settlement process' targeted by the statute was originally limited to the negotiation and execution of mortgage contracts, the scope of the statute's provisions was expanded in 1990 to encompass loan servicing.'" *Id.* (quoting *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013) (other quotations omitted)). "As a remedial statute, RESPA is construed broadly to effectuate its purposes." *Marias*, 736 F.3d at 719 (internal quotations omitted).

Regulation X consists of the Mortgage Servicing Rules promulgated by the Consumer Financial Protection Bureau ("CFPB") pursuant to § 1022(b) of the Dodd-Frank Act, 12 U.S.C. § 5512(b), and RESPA, 12 U.S.C. § 2601, *et seq. Cooper v. Fay Serv., LLC*, 115 F. Supp. 3d 900,

903 n.6 (S.D. Ohio 2015). Regulation X imposes certain obligations on a loan servicer with respect to loss mitigation generally and the processing of a borrower's loan modification application. *James*, 2017 U.S. Dist. LEXIS 203790, at *10 (internal citations omitted).

"Whoever fails to comply with any provision of [RESPA] shall be liable to the borrower for each such failure[.]" 12 U.S.C. § 2605(f). If liability is established, "an individual may recover actual damages, and any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of RESPA and Regulation X, in an amount not to exceed $2,000." *James*, 2017 U.S. Dist. LEXIS 203790, at *10 (citing 12 U.S.C. § 2605(f)(1)). "An individual also may be awarded the costs of the action and reasonable attorneys' fees." *Id.* (citing 12 U.S.C. § 2605(f)(3)).

*1. 12 C.F.R. § 1024.41(b)(2)(i)(A)-(B)*

If a complete loss mitigation application is received at least 45 days prior to a foreclosure sale, the servicer must "promptly review a loss mitigation application for completeness and '[n]otify the borrower in writing within 5 days . . . after receiving the loss mitigation application that the servicer . . . has determined that the loss mitigation is either complete or incomplete." *Washington v. Green Tree Serv. LLC*, No. 1:15-cv-354, 2017 U.S. Dist. LEXIS 69330, at *19 (S.D. Ohio May 5, 2017), report and recommendation adopted, 2017 U.S. Dist. LEXIS 92038, 2017 WL 2599252 (quoting 12 C.F.R. § 1024.41(b)(2)(i)). An application is complete if the "servicer has received all the information that the servicer requires from a borrower in evaluating applications of the loss mitigation options available." 12 C.F.R. § 1024.41(b). If the application is complete, the servicer must acknowledge its receipt within five days; if it is incomplete, the servicer must provide notice of the documents needed to make it complete within five days. (*Id.*). The five-day period excludes legal public holidays, Saturdays, and Sundays. § 1024.21(b)(2)(i).

Plaintiff sent a loss mitigation application to MDK via email on December 5, 2014. (Doc.

27-6 at 2). There was no foreclosure sale scheduled when she sent it. On December 11, 2014, an employee of MDK, Samantha Janning, sent Plaintiff an email stating, "I've sent everything to [Defendant] for review and I will let you know of any additional documents that are needed." (*Id.* at 1).

On December 16, 2014, Defendant sent Plaintiff a letter notifying her that, as of that date, defendant could not complete its review of Plaintiff's "loan because some financial information . . . [was] missing or incomplete." (Doc. 27-7 at 1). The letter also directed Plaintiff to provide pay stubs, bank account statements, and tax returns to Defendant no later than January 20, 2015. (*Id.*). On January 5, 2015, Plaintiff submitted the requested application materials to MDK. (Doc. 27-8 at 2).

On January 6, 2015, Ms. Janning again sent Plaintiff an email. This time, Ms. Janning asked for a signed and dated letter explaining a bonus that had appeared on Plaintiff's application materials. (*Id.* at 1). Plaintiff sent a letter explaining the bonus to Ms. Janning on January 7, 2015, and that same day Ms. Janning confirmed that the letter was forwarded to Defendant and Ms. Janning would let her know once there was more information. (*Id.* at 1, 13).

On January 14, 2015, Ms. Janning asked for additional information. Specifically, Ms. Janning requested Plaintiff to explain a $1,200 withdraw on her December bank statement. (Doc. 27-10 at 1). Plaintiff again responded the same day and provided the requested information. The next day, January 15, 2015, Ms. Janning acknowledged receipt. (*Id.* at 1, 6).

Plaintiff argues Defendant violated Regulation X at § 1024.41(b)(2) by allowing more than five business days between its receipt of and response to her loss mitigation application and subsequently requested documents. (Doc. 27 at 9). Defendant counters that the five-day period under § 1024.41 began not when Plaintiff sent the loss mitigation application and supplemental

documents to MDK, but when MDK forwarded them to Defendant. (Doc. 28 at 4–5). For this argument, Defendant claims that MDK is not a "servicer" for the purposes of RESPA and, based upon the dates that Defendant received the documents from MDK, it did not violate RESPA. (*Id.*). Defendant further argues that "expanding the definition of 'servicer' to include its counsel" construes RESPA "so broadly to the point where its overall purpose becomes unrecognizable." (*Id.* at 4). Put simply, Defendant argues that it did not matter when MDK received the application; all that matters is when Defendant received the application. Defendant, however, cites no law to support its reading of "servicer" in § 1024.41, and the Court does not find it persuasive.

"Servicer" is defined under RESPA as "the person responsible for servicing of a loan," and "servicing" is "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(2)-(3). Servicer's agents are treated as servicers for the purposes of § 1024.41. *See Swanson v. Bayview Loan Serv. LLC*, No. 6:15-cv-1078, 2016 U.S. Dist. LEXIS 94180, at *7–9 (M.D. Fla. July 19, 2016) (denying motion to dismiss where servicer argued it was not liable under § 1024.41 because the borrower contacted servicer's counsel and not the servicer directly); *see also DeLeon v. Ocwen Loan Serv.*, No. 16-10402, 2016 U.S. Dist. LEXIS 118194, at *7, 2016 WL 4575314 (D. Mass. Sept. 1, 2016) (implying that contacting servicer's agent about a loan modification could create liability for the servicer under § 1024.41); *McKerracher v Green Tree Serv., LLC*, No. 1:15-cv-235, 2015 U.S. Dist. LEXIS 175682, at *16 (W.D. Mich. Dec. 17, 2015) (finding that borrower's contact with servicer's agent created obligations for the servicer under § 1024.41). The Court notes there are cases where RESPA claims are dismissed because the borrower failed to communicate directly with the servicer of a loan. *See, e.g., Bishop v.*

*Quicken Loans, Inc.*, No. 2:09-01076, 2010 U.S. Dist. LEXIS 93692, at *18 (D. WV. Sept. 8, 2010) (citations omitted).  These cases, however, are distinguishable as they are confined to qualified written requests under 12 U.S.C.S. § 2605(e) (2018).  Accordingly, the Court follows the holding in *Swanson*.

The undisputed facts establish that Defendant did not respond to Plaintiff's loss mitigation within five days required by Regulation X.  If a complete loss mitigation application is received at least 45 days prior to a foreclosure sale, the servicer must "[n]otify the borrower in writing within 5 days . . . after receiving the loss mitigation application that the servicer . . . has determined that the loss mitigation is either complete or incomplete."  12 C.F.R. § 1024.41(b)(2)(i)(B).  Plaintiff sent her loss mitigation application to MDK on December 5, 2014, and Defendant did not acknowledge the receipt of the application and communicate whether it was complete until December 16, 2014.  Accordingly, Defendant did not notify Plaintiff within five days (excluding legal public holidays, Saturdays, and Sundays) that the application was complete or incomplete in violation of § 1024.41(b)(2)(i)(B).  Indeed, Defendant was two days late.

And Defendant missed another deadline.  After Defendant notified Plaintiff that her application was incomplete, she sent supplemental documents to MDK on January 5, 2015.  Defendant was silent until January 14, 2015, seven business days after it received the application.  Thus, for a second time, Defendant missed its five-day window by two days.  Importantly, although MDK periodically communicated with Plaintiff following the submission of her loss mitigation application and subsequent requested documents, these communications were insufficient because they did not inform plaintiff whether the application was complete or incomplete as required by § 1024.41(b)(2)(B).

Although Plaintiff has shown two RESPA violations, recovery under the statute requires

more.  "The Plaintiff must suffer actual, demonstrable damages, and the damages must occur as a result of the specific violation."  *Justice v. Ocwen Loan Serv.*, No. 2:13-cv-165, 2015 U.S. Dist. LEXIS 5665, at *50–51, 2015 WL 235738 (S.D. Ohio Jan. 16, 2015) (internal quotations omitted).  As stated, RESPA recognizes two types of damages: 1) actual damages the borrower sustained as a result of the RESPA violation, and 2) "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." 12 U.S.C. § 2605(f)(1).  Actual damages are "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses."  *Justice*, 2015 U.S. Dist. LEXIS 5665, at *51–52 (explaining that the common definition of actual damages applies in the RESPA context) (citations omitted).  "Keeping in mind that RESPA is a remedial statute that is construed broadly to effectuate its purpose . . . actual damages [encompasses] all expenses, costs, fees, and injuries fairly attributable to [the servicer's] failure to respond appropriately pursuant to the regulations."  *Id.* at *52.  (internal quotations and citations omitted).  As explained below in section III.A.6. of this Opinion and Order, Plaintiff has not shown a practice or pattern of noncompliance.  Thus, Plaintiff must rely on actual damages in order to recover.

The Court finds that Plaintiff has not done so.  More specifically, Plaintiff did not produce sufficient evidence to establish that she suffered actual damages because of Defendant's combined four days of delay.  *See, e.g.*, *Grustch v. Wells Fargo Bank, N.A.*, No. 2:15-cv-2583, 2017 U.S. Dist. LEXIS 42429, at *17, 2017 WL 1091681 (S.D. Ohio Mar. 23, 2017) (indicating a borrower cannot maintain a claim where servicer takes six days to respond to a loss mitigation application with no showing of actual damages resulting from the additional day).  Plaintiff has not produced evidence, in her affidavit (Doc. 27-2) or otherwise, of legal fees or other costs incurred due to Defendant's tardy acknowledgements.  *Cf. Paz v. Seterus, Inc.*, No. 14-62513, 2016 U.S. Dist.

LEXIS 186562, at *18–19, 2016 WL 3948053 (S.D. Fla. Apr. 28, 2016) (borrower's incursion of attorney fees due to servicer's errors in handling a loss mitigation application was adequate to establish a genuine issue of material fact under RESPA); *Guillermo v. Caliber Home Loans, Inc.*, No. 14-04212, 2015 U.S. Dist. LEXIS 99178, at *13 (N.D. Cal. July 29, 2015) (borrower's incursion of additional late fees and lost wages from time spent trying to avoid foreclosure adequately stated claim of actual damages). Plaintiff has stated that "[a]s a result of [Defendant's] refusal to honor the Modification ever increasing arrearage on the loan, and threats of foreclosure, I was forced to retain counsel and incur attorney's fees in defense of [Defendant's] attempt to continue the state foreclosure case." (Doc. 27-2 at ¶ 29). But these fees are not relevant to liability under § 1024.41(b)(2)(i)(B) because, in Plaintiff's own words, they were "a result of [Defendant's] refusal to honor the Modification," not its delay in acknowledging her application.

Instead, Plaintiff's argument rests on emotional damages. The Sixth Circuit has held that actual damages under RESPA may include emotional damages. *Houston v. U.S. Bank Home Mortg. Wisc. Serv.*, 505 F. App'x 543, 548 (6th Cir. 2012). However, to recover under RESPA, a plaintiff must present evidence to establish a causal link between the servicer's noncompliance and the claimed damages. *Miller v. Caliber Home Loans, Inc.*, No. 3:16-cv-621, 2018 U.S. Dist. LEXIS 25504, at *11, 2018 WL 935439 (W.D. Ky. Feb. 16, 2018) (citations omitted). Applied here, Plaintiff must show that her emotional distress is linked to Defendant's failure to acknowledge her application within five business days. *Id.* at *12 (dismissing RESPA claims for lack of evidence showing causal link between defendant's failure to send notice and emotional distress.).

Plaintiff claims that she has experienced a tremendous emotional toll due to Defendant's RESPA violations. (*See generally* Doc. 27-2). Specifically, "[t]he loss mitigation process and

handling of my loan modification by [Defendant] . . . resulted in sleepless nights, anxiety, stress, and a great deal of uncertainty in my life and the lives of my family." (*Id.* at ¶ 32). Plaintiff points to "extreme stress and anxiety" while pregnant, having a child in fear of keeping her home, and that she "remains in fear that her family . . . will lose our home." (*Id.* at ¶¶ 21–25, 27).

The Court does not reject out of hand Plaintiff's evidence of emotional distress but, fatally, the timing is off. The emotional distress Plaintiff alleges stems from the rejection of her application for a permanent loss mitigation application, not Defendant's combined four days of delay in responding to her application for a temporary modification. Plaintiff's Affidavit drives this point home:

> The modification denial and [Defendant's] handling of my loss mitigation application was very stressful for my family and me. When we were approved for the modification, we had recently found out I was pregnant with our youngest child. We were relieved to put this part of our lives behind us, move on, and bring home a healthy baby. That relief quickly turned to fear and worry. The denial caused several sleepless nights and anxiety about losing our family home with a baby on the way. I knew stress was not healthy for me or our baby, so I had to ultimately limit my verbal communication with MDK and [Defendant]. I was very emotional when talking about our position with [Defendant]. It was hard for me to control my emotions, and I would and still do get very upset when thinking about this process.

(*Id.* at ¶ 30). The stress, sleepless nights, and strained pregnancy resulted from Defendant's denial of the modification, long after its delay in responding to her loss mitigation application. In fact, Plaintiff was relieved when she was approved for the temporary modification and, according to her affidavit, the emotional distress did not begin until after this approval. (*Id.*)

The only evidence of emotional distress potentially related to the loss mitigation application and subsequent requests is Plaintiff's testimony that "[w]ith every additional, unreasonable request and explanation by [Defendant], such as incomplete and unexplained requests for a letter of explanation . . . I suffered emotional distress and an increased feeling of

helplessness." (*Id.* at 25). Even this statement, however, is no enough because Plaintiff claims emotional damages stemming from the unreasonable requests, not Defendant's delay. Consequently, Plaintiff has failed to present evidence of a causal link between Defendant's violation of § 1024.41(b)(2)(i)(B) and her emotional damages, and summary judgment is therefore granted to Defendant on this claim. *See Miller*, 2018 U.S. Dist. LEXIS 25504, at *11.

### 2. *12 C.F.R. § 1024.41(b)(1)*

Regulation X requires a servicer to exercise "reasonable diligence in obtaining documents and information to complete a loss mitigation application." 12 C.F.R. § 1024.41(b)(1). Servicers may request "the documents and information necessary to make the loss mitigation application complete," though a duty of "reasonable diligence" is imposed during the information-gathering process. 12 C.F.R. § 1024.41(b)(1). However, "Regulation X affords servicers latitude in determining what information is needed in evaluating applications." *Gutsch v. Wells Fargo Bank, N.A.*, No. 2:15-cv-2583, 2017 U.S. Dist. LEXIS 42429, at *18, 2017 WL 1091681 (S.D. Ohio Mar. 23, 2017).

Section 1024.41 does not define "reasonable diligence," but courts interpreting the regulation have found that "a servicer may fail to exercise reasonable diligence if it repeatedly requests documents it already possesses or documents that it knows or should know are not required to complete the borrower's application." *Benner v. Wells Fargo Bank, N.A.*, No. 2:16-cv-00467, 2018 U.S. Dist. LEXIS 52716, at *30–32, 2018 WL 1548683 (D. Me. Mar. 29, 2018) (citations omitted). The CFPB has also suggested that to meet the reasonable diligence standard a server must "promptly request the additional information or a corrected version of a previously submitted document" if the servicer determines during its review of a loss mitigation application that such information is necessary. 12 C.F.R. § 1024, Supp. I, cmt. 41(b)(2)(i)(B) ¶ 1.

Plaintiff suggests that Defendant "violated the due diligence requirements of Regulation X by requesting documents and information already in its possession . . . ." (Doc. 27 at 11). However, from Plaintiff's first application for a loan modification until her final submission of Required Documents to obtain a permanent modification, the only document Plaintiff believes Defendant improperly requested to complete her December 2014 application was her bank statement. (Doc. 21-1 at 46–47). Plaintiff does not cite any authority to support her argument that the bank statements were not needed to evaluate her application for loss mitigation. (*See generally* Doc. 27 at 11–12; Doc. 29 at 5–7). Nor does Plaintiff cite instances in which the Defendant requested documents that were already in its possession. (*Id.*). Finally, Plaintiff has not provided any evidence that Defendant failed to act promptly when it deemed additional documents necessary, and the record evidence shows otherwise.

In addition to Plaintiff's arguments that Defendant was not reasonably diligent in evaluating her loss mitigation application, she also argues that Defendant failed to exercise reasonable diligence by rejecting her submissions of the documents required to obtain a permanent modification due to notary errors. (Doc. 27-13, 27-15, 27-18). More specifically, Plaintiff argues Defendant violated § 1024.41(b) by its "repeated requests for additional executed modifications and its failure to board the executed modification." (Doc. 27 at 12). Here, Plaintiff misses the mark.

The section of Regulation X requiring reasonable diligence is concerned with loss mitigation applications, not a borrower's response to an offer for a permanent loan modification. 12 C.F.R. § 1024.41(b)(1) ("A servicer shall exercise reasonable diligence in obtaining documents and information to complete a *loss mitigation application*." (emphasis added)). Defendant's handling of the Required Documents submitted to obtain a permanent modification is not under

the purview of § 1024.41(b)(1) because Plaintiff's loss mitigation application had already been approved.  Defendant complied with § 1024.41(b)(1) so the Court grants summary judgment in its favor on this claim.

### 3.  12 C.F.R. § 1024.41(c)(1)

Plaintiff next alleges Defendant failed to evaluate and inform her of the loss mitigation options available to her within thirty days after receiving the December 2014 application.  (Doc. 1 at ¶¶ 61–62).  If a complete application is received at least thirty-seven days prior to a foreclosure sale, within 30 days the servicer shall evaluate the borrower's loss mitigation options and so notify the borrower.  12 C.F.R. § 1024.41(c)(1).  As discussed earlier, Defendant received Plaintiff's loss mitigation application on December 5, 2014.  (Doc. 27-6).  Defendant made multiple requests for additional documents and the application was deemed complete on January 16, 2015.  (Doc. 25-1 at 4).  On January 23, 2015, Defendant approved Plaintiff for a trial modification (Doc. 25-7 at 1); thus, only seven days passed between Plaintiff's submission of a complete application and approval for a temporary modification.  This means Defendant evaluated Plaintiff's loss mitigation options and notified her within thirty days of its receipt of a complete application.  Defendant complied with § 1024.41(c)(1) so the Court grants summary judgment in its favor.

Further, summary judgment for Defendant is proper because Plaintiff abandoned her § 1024.41(c)(1) claim by failing to address Defendant's motion for summary judgment.  The Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."  *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (holding that a district court properly declined to consider the merits of a claim when a plaintiff fails to address it in response to a motion for summary judgment); *Clark v City of Dublin*, 178 F. App'x 522, 524–

25 (6th Cir. 2006) (holding a plaintiff abandons its claims by failing to respond to arguments made in a defendant's motion for summary judgment).

### 4. 12 C.F.R. § 1024.41(e)(2)(i)

Plaintiff next claims that Defendant violated RESPA by wrongly rejecting her application for a loss mitigation option. (*See* Doc. 31 at 10 (making clear that Plaintiff is asserting a violation of § 1024.41(e)(2)(i))). At base, Plaintiff argues that RESPA protects her from a servicer erroneously rejecting her valid acceptance of a loss mitigation option.

To analyze this argument, the Court first looks to the rule implementing RESPA's loss mitigation procedures, which narrows the application of subsequent rules:

> Nothing in § 1024.41 imposes a duty on a servicer to provide any borrower with any specific loss mitigation option. Nothing in § 1024.41 should be construed to create a right for a borrower to enforce the terms of any agreement between a servicer and the owner or assignee of a mortgage loan, including with respect to the evaluation for, or offer of, any loss mitigation option or to eliminate any such right that may exist pursuant to applicable law.

12 C.F.R. § 1024.41(a). In promulgating the rules implementing RESPA, the CFPB mandated "processes that provide consumer protections without mandating specific outcomes, primarily due to concern that a focus on outcomes would adversely affect the housing market and the ability of consumers to access affordable credit." James H. Pannabecker & David McF. Stemler, *The RESPA Manual: A Complete Guide to the Real Estate Settlement Procedures Act* § 14.10 (4th ed. 2018). Regulation X "imposes certain obligations on a loan servicer with respect to loss mitigation generally and the processing of a borrower's loan modification application." *James v. Ocwen Loan Serv., LLC*, No. 1:17-cv-501, 2017 U.S. Dist. LEXIS 203790, 2017 WL 6336760 (S.D. Ohio Dec. 12, 2017).

Regulation X section 1024.41(e) governs servicers' conduct in setting and enforcing the deadlines by which a borrower must accept or reject a loss mitigation offer. It reads in relevant

part:

> (1) [I]f a complete loss mitigation application is received 90 days or more before a foreclosure sale, a servicer may require that a borrower accept or reject an offer of a loss mitigation option no earlier than 14 days after the servicer provides the offer of a loss mitigation option.
>
> (2)(i) [A] servicer may deem a borrower that has not accepted an offer of a loss mitigation option within the deadline established pursuant to paragraph (e)(1) of this section to have rejected the offer of a loss mitigation option.
>
> (2)(ii) A borrower who does not satisfy the servicer's requirements for accepting a trial loan modification plan, but submits the payments that would be owed pursuant to any such plan within the deadline established pursuant to paragraph (e)(1) of this section, shall be provided a reasonable period of time to fulfill any remaining requirements of the servicer for acceptance of the trial loan modification plan beyond the deadline established pursuant to paragraph (e)(1) of this section.

12 C.F.R. § 1024.41(e).

A plain reading of § 1024.41(e) and caselaw indicates that a servicer may be liable under this section in two circumstances: 1) failing to set a valid deadline—of at least 14 days after the offer—by which a borrower must accept the offer of a loss mitigation option; or 2) failing to honor a deadline the servicer initially set. *See* 12 C.F.R. § 1024.41(e)(1); *Washington v. Green Tree Serv. LLC*, No. 1:15-cv-354, 2017 U.S. Dist. LEXIS 69330, at *24–27 (S.D. Ohio May 5, 2017) (holding a servicer violated § 1024.41(e)(2)(ii) when it denied a loan modification for failure to complete requirements by the deadline, but previously told the borrower she had eighteen additional days to complete the requirements). Defendant did not violate either deadline requirement. Defendant allowed at least fourteen days for Plaintiff to accept its offer of a loss mitigation and an additional 14 days to resubmit the Required Documents after each rejection. (Docs. 27-12; 27-14; 27-16). Plaintiff's fourth submission was after the validly set deadline and Defendant rejected it under the authority granted to servicers by § 1024.41(e)(2)(i).

Plaintiff seeks to hold Defendant liable under § 1024.41(e)(2)(i)—a section of Regulation

X that gives a servicer a right to treat a borrower as if they rejected a loss mitigation offer if it is not accepted within a validly set deadline. The Court is therefore forced to grapple with the following question: Is a "wrongful rejection" of a loss mitigation option, without regard to setting or enforcing deadlines, a violation of § 1024.41(e)(2)(i)?

The parties did not brief this issue, but the Court's independent review of the relevant caselaw uncovered one case holding § 1024.41(e) supports a general "wrongful rejection" claim. *Duffy v. Wells Fargo Bank, N.A.*, No. 16-4453, 2017 U.S. Dist. LEXIS 83119, at *24–25, 2017 WL 2364196 (D. N.J. May 31, 2017). The *Duffy* court held a borrower stated a valid claim under § 1024.41(e) where the servicer rejected an agreement for a loan modification due to borrower's omission of a signature, but no respective signature line appeared on the agreement. *Id.* at *25. *Duffy*, however, was decided at the pleading stage and the decision offers no guidance on the elements a plaintiff must establish to show a servicer "wrongfully rejected" an offer for a permanent loan modification under 12 C.F.R. § 1024.41(e)(2)(i). *See id.* The *Duffy* decision sits alone in indicating there is a cause of action available for "wrongful rejection" in general under § 1024.41(e).

This Court comes to a different conclusion. The plain language of the provision gives a servicer the right to treat a borrower as if she rejected an offer for a loss mitigation option if the borrower does not accept it by the validly set deadline. Accordingly, it provides an option to the servicer but requires nothing of the servicer. Because it requires nothing, there can be no violation. The Court's conclusion is bolstered by the fact that the entirety of § 1024.41(e) governs timing, not substance. If this Court were to read § 1024.41(e) as imposing a substantive requirement that a servicer not reject a loss mitigation option application under certain conditions, the statute would be transformed. The Court will not do so and finds no violation of § 1024.41(e)(2)(i), even if the

rejection here was "wrongful."

Importantly, however, Plaintiff is not without a remedy. This question of erroneous rejection is resolved under contract law principles as discussed in section III.B. of this Opinion and Order. *See Vassalotti v. Wells Fargo Bank, N.A.*, 732 F. Supp. 2d 503, 509–10 (E.D. Pa. 2010) (holding that "plaintiff's assertion that the defendant's response was contrary to the terms of the agreement yields an action for breach of contract, not a violation of RESPA") (citing *Jones v. Select Portfolio Serv., Inc.*, No. 08-972, 2008 U.S. Dist. LEXIS 33284, at *28, 2008 WL 1820935 (E.D. Pa. Apr. 22, 2008)).

### 5. 12 C.F.R. § 1024.38(b)(2)

Plaintiff next argues that Defendant violated 12 C.F.R. § 1024.38(b)(2). (Doc. 1 at ¶ 65). This Court need not address Plaintiff's substantive claim because Plaintiff has no right of action under 12 C.F.R. § 1024.38. The CFPB expressly addressed this issue in its final rule adopting the regulation:

> Ultimately, the Bureau agrees with the commenters that allowing a private right of action for the provisions that set forth general servicing policies, procedures, and requirements would create significant litigation risk . . . The Bureau believes that supervision and enforcement by the Bureau and other Federal regulators for compliance with and violations of § 1024.38 respectively, would provide robust consumer protection without subjecting servicers to the same litigation risk and concomitant compliance costs as civil liability for asserted violations of § 1024.38.

78 Fed. Reg. 10778-10779. Based on the official interpretation, the Court concludes that while § 1024.38(b)(2) protects Plaintiff, she lacks a private right of action to enforce the rule provision against Defendant. *James v. Ocwen Loan Serv., LLC*, No. 1:17-cv-0501, 2017 U.S. Dist. LEXIS 203790, at *11 n.5, 2017 WL 6336760 (S.D. Ohio Dec. 12, 2017), report and recommendation adopted, 2018 U.S. Dist. LEXIS 35965, 2018 WL 1173035. Additionally, Plaintiff has abandoned this claim due to her failure to address Defendant's motion for summary judgment. *Id.* (citing

*Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006)).  Accordingly, Defendant is granted summary judgment on Plaintiff's § 1024.41(b)(2) claim.

### 6.  *12 U.S.C. § 1601, et seq.*

Plaintiff argues that Defendant engaged in a pattern or practice of noncompliance with the requirements of RESPA.  (Doc. 1 at ¶ 67).  If an individual establishes a pattern or practice of noncompliance with the requirements of RESPA and Regulation X, under 12 U.S.C. § 2605(f)(1)(B) they may recover statutory damages in an amount not to exceed $2,000.00. *James*, 2018 U.S. Dist. LEXIS 203790 at *20–21.  To establish a pattern or practice of noncompliance, "one or two violations alone are insufficient."  *Id.* (citing *Moore v. Caliber Home Loans*, No. 1:14-cv-852, 2015 U.S. Dist. LEXIS 117737, 2015 WL 5162482, at *8 (S.D. Ohio Sept. 3, 2015) (further citations omitted).  Plaintiff has established that Defendant violated RESPA twice, and two violations alone are insufficient to establish a pattern or practice of noncompliance. Defendant did not engage in a pattern or practice of RESPA violations so summary judgment is granted in its favor.

### B.  Breach of Contract

Beyond the RESPA claims, Plaintiff asserts breach of contract.  The Court first addresses two preliminary matters.  At the start, the Court must consider whether a state-law breach of contract claim is available in this circumstance—in other words, whether federal law preempts such a claim.  In 2012, the United States Court of Appeals for the Seventh Circuit held that a servicer's failure to offer a loan modification under HAMP can serve as the basis of a state-law claim.  *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 585 (7th Cir. 2012) (holding that federal law does not preclude a borrower from pursuing state-law claims, including breach of contract,

where a borrower breaches a loan modification under HAMP). In *Wigod*, a borrower alleged that the lender had breached its promise to permanently modify her mortgage if she successfully completed a trial loan modification and she qualified under HAMP guidelines. *Id.* at 555. The Seventh Circuit allowed the state-law claim to proceed because "[t]he absence of a private right of action from a federal statute provides no reason to dismiss a claim under state law just because it refers to or incorporates some element of the federal law." *Id.* at 558. The United States Court of Appeals for the Sixth Circuit has followed suit. *See Pittman v. Experian Info. Sol., Inc.*, 901 F.3d 619, 631–32 (6th Cir. 2018); *see also Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 166–67 (6th Cir. 2014); *Bolone v. Wells Fargo Home Mortg., Inc.*, 858 F. Supp. 2d 825, 832 (E.D. Mich. 2010) (holding HAMP does not preempt a common law breach of contract claim). Accordingly, Plaintiff may bring a breach of contract claim in this instance.

Next, the Court addresses which law applies to this claim. The parties briefed the issue pursuant to Ohio law, and the Court's independent review of the evidence revealed that the permanent modification instruments at issue are "governed by Federal law and the law of the jurisdiction in which the Property is located," which is Ohio. (Doc. 25 at 13; Doc. 27 at 15; Docs. 27-13 at 11; 27-15 at 11; 27-18 at 29). Under Ohio law, the elements of a breach of contract claim are: 1) the existence of a contract; 2) performance by the plaintiff; 3) breach by the defendant; and 4) damage or loss to the plaintiff as a result of the breach. *Ohio Nat'l Life Assur. Corp. v. Crescent Fin. & Ins. Agency, Inc.*, No. 1:15-cv-727, 2016 U.S. Dist. LEXIS 19608, at *3, 2016 WL 659153 (S.D. Ohio Feb. 18, 2016) (citing *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012)). "Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Williams v. Ormsby*, 966 N.E.2d 255, 258 (Ohio

2012). As explained below, the stickiest part of the parties' dispute is whether a contract was ever formed.

### 1. Offer and Acceptance

Both sides agree that Defendant made an offer but dispute whether Plaintiff did enough to accept. Following Plaintiff's completion of the trial loan modification period, Defendant notified Plaintiff that she had "been approved for a loan modification under the Federal Housing Administration's Home Affordable Modification Program (FHA-HAMP)." (Doc. 25-9). The offer letter stated that Plaintiff was required to sign and notarize the Required Documents and make her first modified payment of $1,508.23 by July 1, 2015, in order to accept the offer. (*Id.*). Plaintiff made the required payment and attempted to submit the Required Documents four times. (Docs. 25-10; 25-12; 25-14; and 26-2). Plaintiff's claim turns on whether any of these submissions was a valid acceptance. It is undisputed that Plaintiff's fourth submission was late pursuant to a validly set deadline under 12 C.F.R. § 1024.41(e)(2). Consequently, the Court analyzes Plaintiff's first three attempts.

Under Ohio law, "the offeror is the master of his offer and may require acceptance in precise conformity with his or her offer before a contract is formed." *Bernabei v. St. Paul Fire & Marine Inc. Co.*, 2005 Ohio App. LEXIS 609, at *7 (5th Dist. Ohio 2005). Similarly, the Restatement of Contracts reads, "[i]f an offer prescribes the . . . manner of acceptance its terms in this respect must be complied with in order to create a contract." Restatement (Second) of Contracts § 60 (Am. Law Inst. 1981). However, the comment to this section goes on to instruct that "frequently in regard to the details of methods of acceptance, the offeror's language, if fairly interpreted, amounts merely to a statement of a satisfactory method of acceptance, without positive requirement that this method *shall* be followed." *Id.* Cmt. (a) (emphasis added).

In *Bergey v. HSBC Bank USA*, an Ohio appellate court applied Restatement § 60 to determine whether a contract had been formed under Ohio law. 2010 Ohio App. LEXIS 2257, at *10–13 (9th Dist. Ohio 2010). In that case, the offeree bank had sent an email accepting an offer but later argued that no contract had been formed because it had not complied with the prescribed method of acceptance. *Id.* More specifically, the offeree bank argued that "[a]ccording to the Offer's own terms, it became a legally binding contract only upon acceptance in writing," which it interpreted to require filling out the "Acceptance" section of the document containing the offer. *Id.* at *10. The court disagreed. Although the offer stated that the acceptance must be in writing, it did not specifically "prescribe how that written acceptance was to be made." *Id.* In other words, the terms merely suggested—but did not require—the offeree to complete the blank "Acceptance" section of the offer to effectuate a valid acceptance. So the email, standing alone, was a valid written acceptance as a matter of law. *Id.*

Shortly after *Bergey* was decided, this Court addressed a somewhat analogous situation in *Bishop v. Children's Center for Developmental Enrichment*, No. 2:08-cv-766, 2011 U.S. Dist. LEXIS 87369, at *17 (S.D. Ohio Aug 8, 2011). Among other terms, the offer in that case stated that the offeree "agrees to pay the sum of money in the amount of $25,000.00" as tuition for the child to attend the school. *Id.* at *18. Although the offeree signed the offer, the offeror later argued that payment was required for contract formation, relying on "the general rule is that, where an offer prescribes the place, time, or manner of acceptance, those terms must be strictly complied with by the offeree." *Id.* at *19 (citing *Ritchie v. Cordray*, 461 N.E.2d 325, 328 (10th Dist. Ohio 1983); Restatement (Second) of Contracts, § 60 (Am. Law Inst. 1981) (other citations omitted)).

The Court disagreed:

The Restatement of the Law of Contracts, to which the *Ritchie* court cites to support this proposition, gives examples of contract language prescribing a mode of

23

acceptance: [1] I must receive your acceptance by return mail; [2] send your boy around with an answer to this by twelve o'clock; [3] you must accept this if, at all, in person at my office at ten o'clock tomorrow.

*Id.* (quotations and citations omitted). It concluded that there "was no specifically prescribed way of acceptance, much less a requirement that [offeree's] acceptance could be made only by performance." *Id.* The "pay the sum of money" language was not "a prescribed manner of acceptance of the contract" and "[u]nless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner reasonable under the circumstances." *Id.* (quoting Restatement (Second) of Contracts, § 30(2) (Am. Law Inst. 1981)).

### a. The Offer

With *Bergey* and *Bishop* as guideposts, the Court analyzes what was required to accept Defendant's offer here. The offer letter includes a section titled, "How to Accept This Offer" and provides:

We have enclosed the following documents that you need to carefully review. We have indicated below which documents need to be signed and returned to us by June 11, 2015 before we can permanently modify your loan. These Documents Include:

1.  Loan Modification Agreement. One copy signed by all borrowers and any other owner(s) of the property in front of a notary.
2.  Partial Claim Subordinate Note. One copy signed by all borrowers.
3.  Subordinate Partial Claim Security Instrument. One copy signed (in front of a notary) by everyone with any ownership interest in the property.

(Doc. 25-9 at 1). The offer letter goes on to state that "[y]ou must also make your first modified payment of $1,508.23 by July 1, 2015," and additionally warns that "[i]f we do not receive your first payment and signed documents by the required dates, (1) your loan may no longer be eligible for this loan modification under FHA-HAP and (2) if your circumstances have not changed, we may proceed with foreclosure as permitted by FHA guidelines and by law." *Id.*

Although the offer letter is just over one page, it lists a number of enclosures, including

"Notary instructions." (*Id.* at 2). Actually titled, "Sample Borrower Signature Page and Notary Instructions" (the "Instructions") (Doc. 25-9 at 5–9), the Instructions provide, in pertinent part:

> These notary instructions are being provided as a reference to assist in accurate completion of you loan documents. Please note that the notary language/requirements may vary depending on the specific state/county requirements. It is your responsibility to make sure that the notary properly notarizes your signatures.
> - Do not fill out the Notary information. This should only be completed by the Notary.
> - Corrections should be lined through and initialed by the Notary. Do not use white-out on the document.

(*Id.* at 6). The Instructions continue and state "[t]he following instructions correspond to the Notary Block above" and provide:

1. The Notary should fill in the applicable state.
2. The Notary should fill in the County where the document is being notarized.
3. The date must match the date that you visit the Notary, and also align with the date you signed in the borrower signature section. (For example, if you visited the Notary on May 17, 2014, this line should be completed to read: "On the 17th day of May in the year 2014 . . .")
4. The notary should fill in his/her name. Note: The Notary cannot have the same last name as the borrower.
5. The Borrower name should be printed here exactly as it appears in the borrower signature section above. In most cases, it will already be pre-printed for the borrower.
   a. If there is a middle initial, the signature must include the middle initial.
   b. If there is no middle initial, the signature should not include the middle initial.
   c. The last name must be signed as printed beneath the signature line and exactly as it appears on the loan at Bank of America. For example, if a borrower uses a hyphenated last name but it is not hyphenated on the loan document, the borrower's signature should match the name as printed on the signature page.
   d. If the borrower name on the agreement includes a suffix (i.e.: Jr., Sr., II, etc.) this MUST be included. Also if the name on the agreement omits a suffix (i.e.: Jr., Sr., II, etc.) this SHOULD NOT be included.
6. The Notary should sign here.
7. The Notary should print his/her name here and stamp their seal on this line. Note: the notary seal should be stamped clearly from corner to corner, with the commission expiration date clearly visible and dark enough to be legible.
8. The Notary should provide the date their commission expires.

(*Id.*).

### b. Plaintiff's Attempts to Accept

As noted, the Court must consider Plaintiff's first three attempts to accept Defendant's offer. Plaintiff's first attempt at submitting the Required Documents occurred on or about June 9, 2015. Defendant argues that several errors were fatal to Plaintiff's acceptance. The most important for the Court's purposes, however, is the fact that Plaintiff inserted her name in the acknowledgment clause where the name of the notary should have appeared. (Doc. 25-10 at 7). In other words, Plaintiff's name was where the notary's name should have been. The Instructions state, "Do not fill out the Notary information." It is at least arguable that this prescriptive statement is clear enough to make this particular instruction a prescribed manner of acceptance, and it is undisputed that Plaintiff did not comply. Thus, Plaintiff's first submission at least potentially was not a valid acceptance. The Court, however, does not need to answer this difficult question because it concludes that Plaintiff's second and third attempts were valid acceptances of Defendant's offer.

Defendant criticizes Plaintiff's second and third attempts for, among other things: the notary signing her name differently on the second and third attempts, the notary not including her full name in the notary section, and the notary not using the same name as the name registered with the State of Ohio. (*See* Doc. 25 at 16–19). Defendant, however, fails to tie these critiques to any aspect of the offer letter, and the Court therefore rejects Defendant's argument that these flaws vitiated acceptance. What is left is Defendant's argument that Plaintiff failed to follow the following part of the Instructions, "[c]orrections should be lined through and initialed by the Notary." (Doc. 25-9 at 6).

In the second attempt, the notary made two changes without initialing them. (Doc. 25-12). And, in the third, the notary and Plaintiff bolded the K and S, respectively, in their names:

On the 15 day of, July in the year 2015 before me, Angela Marie Kent Notary Public, personally appeared Nicole L. Schoen, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

_____ Notary Signature

Angela Marie Kent _____ Notary Public Printed Name Please Seal Here

05-18-2016 _____ Notary Public Commission Expiration Date

Angela Marie Kent
Notary Public, State of Ohio
My Commission Expires 05-18-2016

By SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any riders(s) executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has executed this Security Instrument.

_____
Nicole L Schoen

State of Ohio

County Franklin

The foregoing instrument was acknowledged before me this (Date), July 15, 2015

by Nicole L. Schoen
(Borrower(s) Name Printed)

_____

Angela Marie Kent
Notary Name

_____
Notary Signature

Notary
(Title or rank)

591 Reynoldsburg NewAlbanyRd
(Residing at) Blacklick Oh 43084

My Commission Expires: 05-18-2016

Angela Marie Kent
Notary Public, State of Ohio
My Commission Expires 05-18-2016

(Docs. 25-12, 25-14). The Court puts aside whether the imperfections in the third attempt amount to "corrections," because, relying on *Bergey* and *Bishop*, the Court concludes that initialing corrections merely suggested a manner of acceptance but did not require strict compliance. Three aspects of the offer letter lead the Court to this conclusion.

*First*, the offer letter's language does not make clear that initialing corrections is the exclusive mode of acceptance. On this point, the Court finds the following illustration from the Restatement of Contracts useful:

> A makes an offer to B and adds, 'my address is 53 State Street.' This is a business address. B sends an acceptance to A's home which A receives promptly. Unless the circumstances indicate that A has made a positive requirement of the place where the acceptance must be sent, there is a contract.

Restatement (Second) of Contracts § 60, Illustration 5 (Am. Law Inst. 1981). *See also Bergey*, 2010 Ohio App. LEXIS 2257, at *10–13 (holding that completion of "Acceptance" section of contract was not required for contract formation). Relatedly, Corbin on Contracts explains that "an offeror can prescribe a single and exclusive mode of acceptance"—even an "unreasonable" one, but the offer must "clearly express[] . . . the intention to exclude all other modes of acceptance." Corbin on Contracts § 3.34 (2018). The treatise goes on to note that "[t]he more unreasonable the method appears, the less likely it will be that a court will interpret the offer as requiring it and the more clear and definite must be the expression of an intention in words." *Id.* Thus, the more unreasonable a requirement is, the clearer it needs to be stated.

While the offer letter provides that acceptance must include signing and notarizing the Required Documents, it does not expressly prescribe the way this must be done. Importantly, the offer letter does not make clear that strict compliance with each and every directive of the Instructions is a must. And parts of the Instructions—like the phrase, "[t]hese notary instructions are being provided as a reference"—imply that they in fact are not requirements but only guideposts. (Doc. 25-9 at 6). Thus, the directive that corrections be initialed is not clear and definite. What is clear, however, is that other modes of acceptance are passable. Specifically, the Instructions note that "language/requirements may vary depending on the specific state/county requirements. It is your responsibility to make sure that the notary properly notarizes your

signatures." (*Id.*).  All of this leads the Court to conclude that the directive that "corrections should be lined through and initialed by the Notary" did not clearly express an intention to exclude all other modes of acceptance.  The Court finds this especially true with regard to the third attempt.  As demonstrated above, the identified errors in that submission were the bolded K and S, and Corbin on Contracts states the Court ought to consider the relationship between reasonableness and clarity.  *See* § 3.34 (2018).  If acceptance required perfection, the letter offer should have expressly stated so.

*Second*, the Court reads the word "should" in this context—that "[c]orrections should be lined through and initialed by the Notary" (Doc. 25-9 at 6)—as merely a suggestion or a best practice, not a mandatory requirement.  The United States Court of Appeals for the Second Circuit has explained the word this way:

> Webster's Dictionary defines the phrase "should be" as something "that ought to be." Webster's Third New Int'l Dictionary 2104 (1st ed. 1993). *See also* Black's Law Dictionary 1379 (6th ed. 1990) ("[The word "should"] ordinarily implies duty or obligation; although usually no more than an obligation of propriety or expediency.") (emphasis added). In contrast, the word "shall" is "used to express a command or exhortation," and is "used in laws, regulations, or directives to express what is mandatory." Webster's Dictionary, at 2085. *See also* Black's Law Dictionary, at 1375 ("As used in statutes, contracts, or the like, this word is generally imperative or mandatory."). Thus, the common meaning of "should" suggests or recommends a course of action, while the ordinary understanding of "shall" describes a course of action that is mandatory.

*United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999).  The Court finds that understanding of "should" is the best fit for the language at issue here.

*Third*, the Court has already noted that the Instructions state that "notary language/requirements may vary depending on the specific state/county requirements," and "[i]t is [the borrower's] responsibility to make sure that the notary properly notarizes your signatures." (Doc. 25-9 at 6).  Consequently, the Instructions indicate their purpose is to ensure that the

execution of the documents complies with applicable law. Ohio Revised Code § 5301.01 governs conveyances, and "Ohio courts favor the validity of a mortgage if the execution of a mortgage 'substantially complies' with the statutory requisites[.]" *In re Robinson*, 403 B.R. 497, 502 (Bankr. S.D. Ohio 2008). Defendant does not dispute Plaintiff's satisfaction of this standard, and the Court likewise finds no reason to doubt that the submissions were sufficient under Ohio law. *Id.* Accordingly, Plaintiff satisfied the notarization requirement, which was a requirement for valid acceptance.

In sum, the Court holds that Plaintiff validly accepted Defendant's offer to enter a permanent loan modification, thereby forming an enforceable contract.

### 2. Breach

As noted, the remaining elements of Plaintiff's contract claim are less difficult. "In order to prove a breach by the defendant, a plaintiff must show that the defendant did not perform on one or more of the terms of a contract." *Jarupan v. Hannah*, 878 N.E.2d 66, 73 (10th Dist. Ohio 2007) (quotations omitted). "A 'material breach of contract' is a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Marion Family YMCA v. Hensel*, 897 N.E.2d 184, 186 (3d Dist. Ohio 2008) (citing Williston on Contracts, § 63:3 (4th ed. 2000)). "[A] material breach of contract will entitle a party to stop performance." *Nious v. Griffin Constr., Inc.*, No. 03AP-980, 2004 Ohio App. LEXIS 3744, at *8 (10th Dist. Ohio Aug. 5, 2004).

Here, Defendant materially breached the contract. Defendant sent Plaintiff a letter stating that it would not grant a permanent loan modification. (Doc. 27-21). Plaintiff performed on the contract by paying the amount required under the permanent loan modification until she received this letter notifying her that Defendant did not intend to perform. (Doc. 27-22). At that point,

Plaintiff was relieved from performance following Defendant's material breach because its failure to recognize the payments rendered Plaintiff's performance impossible. *See Marion Family YMCA*, 879 N.E.2d at 186; *Nious*, 2004 Ohio App. LEXIS 3744, at *8.

### 3. Damages

At this stage, Plaintiff has sought summary judgment as to liability and has requested the court to subsequently "hold a hearing on the damages caused by [Defendant's] breach of contract." (Doc. 27 at 17). In the alternative, Plaintiff asks the Court to order specific performance under the contract. (*Id.*). The Court concludes that the better course is to determine damages at a subsequent proceeding. Accordingly, summary judgment is granted to Plaintiff for her breach of contract claim on liability, and appropriate damages will be determined at a subsequent proceeding before the Court.

### C. Fraud

Defendant seeks summary judgment on Plaintiff's fraud claim. (Doc. 25 at 23–25). In Ohio, the elements of common law fraud are the following:

(a) a representation or, where there is a duty to disclose, concealment of a fact,

(b) which is material to the transaction at hand,

(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(d) with the intent of misleading another into relying upon it,

(e) justifiable reliance upon the representation or concealment, and

(f) a resulting injury proximately caused by the reliance.

*Washington v. Green Tree Serv. LLC*, No. 1:15-cv-354, 2017 U.S. Dist. LEXIS 69330, at *37–38 (S.D. Ohio May 5, 2017), report and recommendation adopted, 2017 U.S. Dist. LEXIS 92038, 2017 WL 2599252 (addressing fraud in the context of loan modification communications between

a borrower and servicer where RESPA claims were also brought) (citing *Burr v. Bd. of Cty. Comm'rs of Stark Cry.*, 491 N.E.2d 1101, 1105 (Ohio 1986)).

Defendant argues Plaintiff cannot prove any of the following: 1) Defendant gave knowingly false information to Plaintiff regarding the permanent modifications; 2) Defendant intended to mislead Plaintiff when offering her the modifications; or 3) damages caused by the reliance. (Doc. 25 at 23). The Court finds merit in Defendant's second argument and, therefore, does not consider the other two.

Plaintiff alleges that she signed, notarized and returned the Required Documents in a timely manner but Defendant provided false information to her by denying the modifications because it "knew that she had complied with the terms required to accept the [m]odification." (Doc. 1 at ¶¶ 84–87, 88). Plaintiff also argues that Defendant sent the August 15, 2015 Modification Denial Letter to mislead Plaintiff into believing that she no longer had a binding modification with Defendant and that the mortgage loan was not modified. (*Id.* at ¶ 95).

Plaintiff has failed to support these arguments with evidence. Defendant informed Plaintiff in writing at least four times that it would not accept the permanent modifications due to perceived errors in the submitted Required Documents. (Doc. 25 at 24; Docs. 25-1, 25-9, 25-11, 25-13, 26-1). Without opining on the legality of these rejections, the Court finds no indication that Defendant intended to mislead Plaintiff by sending these four letters. Plaintiff has failed to point to any evidence indicating Defendant intended to mislead Plaintiff when offering her loan modifications.

Additionally, Plaintiff has not sought summary judgment on the fraud claim in her cross motion nor has she responded to Defendant's motion for summary judgment arguments on fraud. (See Doc. 27; Doc. 29). Upon review, the Court finds Plaintiff's fraud claims have been abandoned. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (holding that a

district court properly declined to consider the merits of a claim when a plaintiff fails to address it in response to a motion for summary judgment); *Clark v City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (holding a plaintiff abandons its claims by failing to respond to arguments made in a defendant's motion for summary judgment).  Plaintiff has not addressed fraud in any of its summary judgment briefing.  (See Docs. 27, 29, 31).  Based on the forgoing, Defendant's motion for summary judgment on Plaintiff's fraud claim is granted.

## IV.    CONCLUSION

For the reason stated above, the Defendant's motion for Summary judgment (Doc. 25) is **GRANTED in PART and DENIED in PART**.  Specifically, the motion is:

- **GRANTED** with respect to Plaintiff's RESPA claims;

- **DENIED** with respect to liability on Plaintiff's breach of contract claim; and

- **GRANTED** with respect to Plaintiff's fraud claim.

Plaintiff's Motion for Summary Judgment (Doc. 27) is **GRANTED in PART and DENIED in PART**.  Specifically, the motion is:

- **DENIED** with respect to Plaintiff's RESPA claims; and

- **GRANTED** with respect to Plaintiff's breach of contract claim on liability.

Further, the Court **SETS** a status conference in this matter for February 27, 2019, at 10:00 a.m. to schedule a hearing on damages.

IT IS SO ORDERED.


Date: February 13, 2019                         /s/ Kimberly A. Jolson
                                                KIMBERLY A. JOLSON
                                                UNITED STATES MAGISTRATE JUDGE